[Cite as *State v. McKee*, 2018-Ohio-3741.]

## IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2017-P-0033** |
| JABARI D. MCKEE, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Portage County Court of Common Pleas, Case No. 2016 CR 00371.

Judgment: Affirmed.

*Victor V. Vigluicci,* Portage County Prosecutor, and *Kristina Reilly,* Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*Paul M. Grant,* 209 South Main Street, Eighth Floor, Suite 3, Akron, OH 44308 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Jabari D. McKee, appeals from the judgment, after a trial to the bench, convicting him of aggravated murder, with a firearm specification; aggravated robbery, with a firearm specification; grand theft of a motor vehicle; and aggravated arson. We affirm the trial court's judgment.

{¶2} The morning of April 20, 2016 commenced like many mornings for the residents surrounding Smith Road in Rootstown, Ohio. The neighbors let their dogs

out, got ready for work, and saw their children off to school. As two neighbors followed their morning routine, they noticed smoke emanating from the residence owned by one Bryan Burns. As one of the men approached the home, he dialed 911; because, however, the vehicle owned by Mr. Burns, a silver Ford Mustang, was not in the driveway, the man did not attempt to enter the home.

{¶3} The Rootstown Fire Department arrived on scene, entered the home, and discovered the source of the smoke and fire. Inside a bedroom, they located the body of a deceased, male victim, who had sustained a gunshot wound to the head and post-mortem burns. Ultimately, investigators determined the deceased male was Mr. Burns.

{¶4} On April 22, 2016, appellant was pulled over in Mr. Burns' silver Mustang. In his possession were two bank cards, each belonging to Mr. Burns.

{¶5} Appellant was eventually charged in a six-count indictment with one count of aggravated murder, an unclassified felony, in violation of R.C. 2903.01(B), while he committed or attempted to commit, or fled after committing or attempting to commit aggravated robbery, in violation of R.C. 2911.01(A)(1) and/or (3), and with a firearm specification pursuant to R.C. 2941.145; one count of aggravated robbery, a felony of the first degree, in violation of R.C. 2911.01(A)(1) and/or (3), with a firearm specification pursuant to R.C. 2941.145; grand theft of a motor vehicle, a felony of the fourth degree, in violation of R.C. 2913.02(A)(1) and (B)(5); two counts of theft of credit cards, felonies of the fifth degree, in violation of R.C. 2913.02(A)(1) and R.C. 2913.71(A); and theft, a misdemeanor of the first degree, in violation of R.C. 2913.02(A)(1). A supplemental indictment was later filed charging him with an additional count of aggravated arson, a felony of the first degree, in violation of R.C. 2902.02(A)(2) and (B)(1). Additional facts

2

relating to the evidence produced in support of these charges will be presented in greater detail in our analysis of appellant's challenge to the manifest weight of the evidence.

{¶6} The matter proceeded to bench trial on May 2, 2017. After receiving evidence, the trial court found appellant guilty of aggravated murder, aggravated robbery, grand theft of a motor vehicle, three counts of theft, and aggravated arson. At the sentencing hearing, the court ordered appellant to serve a term of life imprisonment without parole eligibility for aggravated murder and three years for the firearm specification; the court ordered appellant to serve five years imprisonment for aggravated robbery and three years for the firearm specification, to be served consecutively to the aggravated murder count; one year imprisonment for grand theft, to be served concurrently with the other sentences; and six years for aggravated arson to run consecutively to the other sentences. The court merged the theft counts into the aggravated robbery count. Appellant now appeals and assigns three errors. We shall address his first and second assignments of error together. They provide:

{¶7} "[1.] McKee was denied his constitutional rights against unreasonable searches and seizures guaranteed by the Fourth and Fourteenth Amendments of the U.S. Constitution and Article I, Section 14 of the Ohio Constitution.

{¶8} "[2.] McKee was denied his right to effective assistance of counsel guaranteed under the Sixth Amendment to the U.S. Constitution and Article I, Sections 1, 10 & 16 of the Ohio Constitution."

{¶9} Under his first assignment of error, appellant contends the cell site information obtained from Sprint for appellant's cell phone, which placed appellant near

3

the Burns' residence at the relevant timeframe, was obtained without a warrant. Appellant maintains it was plain error for trial counsel not to object to these records. Similarly, appellant contends trial counsel was ineffective for failing to move to suppress the cell phone records that he claims were obtained without a warrant. These arguments lack merit.

{¶10} During trial, Lt. Johnson specifically testified he prepared several search warrants for phone records, including a warrant for appellant's records. Specifically, he stated:

{¶11} Lt. Johnson: On April 26, 2016, is when I prepared - - actually I prepared three search warrants for phone records at that time, one of which included Jabari McKee.

{¶12} Prosecutor: And did you receive any information from Sprint as a result of those search warrants?

{¶13} Lt. Johnson: Yes, I did. I did get the results from my request.

{¶14} Prosecutor: And when you got the results back, what did you do with the results?

{¶15} Lt. Johnson: I conducted a review of them. I have some experience dealing with phone records, so I wanted to take a look to see what information I could find.

{¶16} Prosecutor: Okay. And what else when you - - other than that, what did you do with them?

{¶17} Lt. Johnson: I worked with BCI, in particular, Special Agent Beth Dailey.

{¶18} * * *

{¶19} Lt. Johnson: How this works is I obtained the search warrant and then I go through the Prosecutor's office and it's submitted. The grand jury coordinator, I work through her, and she has the contact information. She sends that request out along with a copy of the search warrant. [Sprint] in turn will email it back and then that is what's sent to me. It's not - - they have stopped sending out hard

4

copies a long time ago. It's all electronically [sic] is what you get back.

{¶20} The testimony of Ricardo Leal, a Sprint records custodian, complimented Lt. Johnson's testimony:

{¶21} Prosecutor: * * * And directing your attention to this case, did you receive two requests for records associated with a cell phone number 330-341-9812 [appellant's number]?

{¶22} Mr. Leal: Yes, ma'am.

{¶23} Prosecutor: Okay. And were those records sent then from your office to –

{¶24} Mr. Leal: Yes.

{¶25} Prosecutor: Greg Johnson at the Portage County Sheriff's Department?

{¶26} Mr. Leal: Yes ma'am. We responded to the legal demands with information that asked for two different date ranges.

{¶27} * * *

{¶28} Prosecutor, I'm handing you what has been marked as State's Exhibit 30A and 30B. Could you please describe to the court what those are?

{¶29} Mr. Leal: Yes, ma'am. So these are the phone records, two different case numbers, because two different requests came in for Sprint for that particular telephone number, but it is the response from Sprint. It contains subscriber information, call detail records with cell site information, as well as cell tower lists for the tower locations for the information that pertains to the records themselves. Amongst that there are some other things, payment information, subscriber information, those types of things.

{¶30} There is nothing in the record that suggests Lt. Johnson was untruthful about preparing the search warrants or that Mr. Leal was mistaken in his testimony that he received the warrants to release the records. Accordingly, we perceive no error, let

5

alone plain error, in the admission of the records; moreover, counsel did not act unreasonably to appellant's prejudice in not filing a motion to suppress the records.

{¶31} Appellant's first and second assignments of error are without merit.

{¶32} Appellant's third assignment of error provides:

{¶33} "McKee's convictions are against the manifest weight of the evidence in violation of the due process clause of the 14th Amendment to the U.S. Constitution and Article I, Sections 1, 10 & 16 of the Ohio Constitution."

{¶34} A court considering a challenge to the manifest weight of the evidence reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed for a new trial. *State v. Swiggett*, 11th Dist. Trumbull No. 2017-T-0003, 2017-Ohio-8203, ¶10, citing *State v. Schlee,* 11th Dist. Lake No. 93-L-082, 1994 WL 738452, *5 (Dec. 23, 1994).

{¶35} Appellant was convicted of aggravated murder, aggravated robbery, grand theft of a motor vehicle, and aggravated arson. Appellant, however, only takes issue with the convictions for aggravated murder and aggravated robbery. Aggravated murder, pursuant to R.C. 2903.01(B), provides, in part: "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated robbery."

{¶36} Aggravated robbery, pursuant to R.C. 2913.01(A)(1), (3) provides:

{¶37} No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately

6

after the attempt or offense, shall do any of the following:  Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it; inflict, or attempt to inflict, serious physical harm on another.

{¶38}  **EVIDENCE ADDUCED AT TRIAL**

{¶39}  On the morning of April 20, 2016, at approximately 5:00 a.m., Stephanie Plona let her dogs out and noticed a light on inside the home of Bryan Burns, who lived across the street from Mrs. Plona and her husband, Joshua.  She also observed Mr. Burns' silver Ford Mustang, which had damage to the driver's side front, in the driveway. When Mr. Plona let the dogs out at 7:30 a.m., he also noticed the Mustang, which he described as green with a damaged fender, in the driveway. Shortly thereafter, he drove his daughter to his father-in-law's house, which is located around the corner from the Plona home.  Each morning, Mr. Plona's father-in-law, Greg Moore, would wait with the girl until the bus arrived and see her off. Mr. Plona dropped off his daughter and never observed the Mustang leave that morning.  There was nothing uncommon about what the Plonas observed or their morning routine.

{¶40}  Although he lived around the corner from the Plonas, Mr. Moore was familiar with Mr. Burns' home and his silver Mustang, which had damage on the front driver's side.  Between 7:37 a.m. and 7:45 a.m., Mr. Moore started his Jeep and noticed the Mustang leaving Mr. Burns' driveway.  He then heard glass break and observed a puff of smoke from behind Mr. Burns' house.  Mr. Moore approached the home and called 911.  He remained until the fire department arrived and took a photograph of the scene, which he sent to Mrs. Plona who, in turn, sent it to her husband.

7

{¶41} Richard and Jessica Marzec reside in a home with a backyard that is diagonal to Mr. Burns' backyard. On April 20, 2016, Mrs. Marzec let her dog out at 5:30 a.m. and noticed lights on in Mr. Burns' home and observed his silver Mustang, with frontal damage, in the driveway. Around 7:50 a.m., Mr. Marzec walked the couple's son to the bus stop and observed smoke coming from Mr. Burns' home and alerted his wife. Neither Mr. nor Mrs. Marzec observed the Mustang in the driveway when the smoke was detected.

{¶42} Brittany Yanoff, who resides on a street perpendicular to the street upon which Mr. Burns resided, had installed surveillance cameras on her home to monitor the bus stop where her kids boarded the school bus. Her cameras were working on the morning of April 20, 2016, and captured Mr. Burns' silver Mustang at a stop sign and turning right in front of her home at 7:46 a.m.

{¶43} After receiving the 911 call, the Rootstown Fire Department arrived at the Burns' residence. Captain Justin Meonske was dispatched and observed a small residential building with smoke emanating from the windows. Capt. Meonske and his crew entered the structure, first observing a deceased dog inside the home. They removed the dog and proceeded into the house, which was engulfed in smoke. As Capt. Meonske searched the home, he discovered the body of an adult, caucasion male in a bedroom. He notified a member of his crew, a fire medic, who moved the victim approximately three to five feet from where he was lying, at which point, the men concluded the victim was obviously deceased.

{¶44} The fire crew swept the home and extinguished any remaining smoldering fires. While making sure all fires were out and not at risk of rekindling, Capt. Meonske

8

noticed a bullet shell casing, later identified as a .9mm NFCR Lugar Cartridge. He additionally addressed the fire crew to make certain the scene was preserved for evidentiary purposes. Capt. Meonske noted the fire's origin was the bedroom, but he did not make a determination regarding its cause. Once a deceased victim is discovered, he stated the fire department ceases its investigation and notifies the State Fire Marshal and the Sheriff's Office. Later, Jeffrey Koehn, a fire investigator for the State Fire Marshal, determined the cause of the fire was incendiary, i.e., arson.

{¶45} Sergeant Harry Muir of the Portage County Sheriff's Office arrived at the scene at approximately 8:00 a.m. He entered the home with Fire Chief Palmer and observed smoke damage throughout the home. He ultimately observed the deceased victim in the bedroom and photographed the body; due to lingering smoke and combustion gases, however, the men left the home. The officers on-scene agreed they should secure a search warrant for the premises in order to further the investigation and identify the victim.

{¶46} Coincidentally, Sgt. Muir was familiar with the Burns' residence, as well as Mr. Burns' silver Mustang. The Portage County Sheriff's Office had made several welfare checks during the previous month due to certain mental health issues from which Mr. Burns suffered. In 2006, Mr. Burns was diagnosed with paranoid schizophrenia and was known to self-medicate with illegal drugs and alcohol; and, according to Mr. Burns' mother, in the month prior to his death, he had become increasingly more paranoid. On March 31, 2016, Sgt. Muir personally checked on Mr. Burns at the request of his parents, by way of a professional service company, due to concerns that he was suicidal. Sgt. Muir spoke with Mr. Burns through a window at the

9

residence. After a conversation, the sergeant did not believe there was sufficient grounds to justify removing the man from his home without a court order. Sgt. Muir observed the vehicle during that visit and noted the car was not in the driveway on the morning of April 20, 2016. As a result, Sgt. Muir reported the vehicle as stolen and entered it into the BOLO ("Be On the Lookout") system.

{¶47} Lieutenant Greg Johnson of the Portage County Sheriff's Office arrived at the Burns' address at approximately 8:15 a.m. He, like Sgt. Muir, was familiar with the residence because it was the subject of welfare checks by the Sheriff's Office. Upon arrival, Lt. Johnson noticed Mr. Burns' Mustang was missing. Due to the condition of the victim's body, it was difficult to identify the same. Hence, under the circumstances, it was still possible Mr. Burns had left in his vehicle. The Sheriff's Office ultimately issued a press release asking the public to report the location of the Mustang if it is sighted.

{¶48} Lt. Johnson ultimately obtained Mr. Burns' cell phone number; he, however, could not reach Mr. Burns. Lt. Johnson subsequently prepared a search warrant for the residence and executed the same.

{¶49} Lt. Johnson next contacted Mr. Burns' mother and learned he had financial accounts with Huntington Bank, and had been issued two bank cards. Huntington informed police that Mr. Burns withdrew $303.00 from an ATM at a Speedway gas station in Rootstown at 1:24 a.m. on April 20, 2016. The manager at the Rootstown Speedway, Danielle Norman, provided security footage of the early morning hours of April 20, 2016; Ms. Norman was familiar with Mr. Burns, identified him on the video, and confirmed that after he entered the store he went directly to the ATM. By this time, Mr. Burns had been identified as the victim of the homicide.

**{¶50}** Don Scurlock, a Huntington Bank Fraud investigator, identified additional activity with Mr. Burns' account on April 20, 2016. First, at 8:56 a.m., an attempted withdrawal of $503.25 was declined at 924 East Exchange Street in Akron, Ohio. Doug Didion, store manager for the Circle K at 924 East Exchange Street in Akron, was working at the store that morning. Mr. Didion reviewed surveillance footage and he identified a man in a gray hoodie, blue jeans or black pants, and black and red sneakers approaching the ATM at 8:54 a.m. The individual remained at the ATM until 8:56 a.m. Still images depict an African American male, in a gray sweatshirt, making a purchase at the counter with "a fair amount of cash in the customer's hand." Mr. Didion identified the vehicle the man was driving as a silver Ford Mustang.

**{¶51}** Mr. Scurlock further identified a second attempted withdrawal of $202.95 that was declined at 9:40 a.m., on the same date, at 19 Arlington Street in Akron, Ohio. Jason Lamm, the store manager for the Family Dollar located at that address, was working at that time and identified, from video surveillance, a silver vehicle pulling into the store which he characterized as a "Mustang, maybe." According to Mr. Lamm, the driver of the vehicle was wearing a gray hoodie and black pants and went to the ATM in the store.

**{¶52}** Kayla Lepley, appellant's girlfriend at the time of the incident, was at 668 Hammel Street, Akron, Ohio, a home at which appellant was staying at the time of the incident. In the early morning hours of April 20, 2016, Ms. Lepley saw Mr. Burns, who she referred to as Preacher, at the Hammel Street home and assumed he was there for drugs. Appellant ultimately left with Mr. Burns and Ms. Lepley did not see appellant until the next day. Upon his return, he and Ms. Lepley visited friends at Summit Lake

Apartments. She noted appellant usually received rides from people because he did not own a car. According to Ms. Lepley, appellant drove them to the apartments in a Mustang.

{¶53} The next day, Ms. Lepley recalled appellant's friend, Jason Butler, visiting the Hammel Street residence. Appellant eventually left with Mr. Butler. According to Ms. Lepley, appellant called her and explained he would return later, but claimed he had to hang up because his phone was about to die. Ms. Lepley did not hear from appellant again.

{¶54} On Friday, April 22, 2016, Lt. Johnson, via a radio in his cruiser, heard that Kent City Police officers were dispatched to a location on State Route 59. They had received a message from someone in the area reporting a silver Mustang described in the press release. Lt. Johnson responded to the location.

{¶55} Kent police located and stopped the vehicle. Appellant was driving the vehicle and Mr. Butler was a passenger. Officers ran the vehicle's license plate and determined it was registered to Mr. Burns. The individuals were ordered out of the vehicle and placed in separate police cruisers. Upon arriving, Lt. Johnson confronted both individuals, each of whom provided identification.

{¶56} According to appellant, he rented the vehicle from a friend with the nickname Preacher and he was returning the car. Appellant confirmed Preacher was the nickname associated with Mr. Burns. Appellant had two Huntington Bank cards in his possession, which he admitted belonged to Preacher. He additionally stated he attempted to use the cards unsuccessfully. Appellant maintained Mr. Burns gave him

the vehicle and bank cards as collateral for a drug transaction on April 20, 2016 because he had no money on that date.

{¶57} Jason Butler had been friends with appellant for approximately eight months prior to April 2016. They spent time together playing chess and talking. Mr. Butler knew appellant did not own an automobile. Mr. Butler did not see appellant on April 20, but did the next day when appellant advised him he would call him later. Around midnight, Mr. Butler received a call from appellant with a request to follow him to drop off a vehicle. Appellant gave Mr. Butler $40 dollars to follow him.

{¶58} The vehicle was a silver Mustang with damage to the front. Mr. Butler had never seen the vehicle before and did not know Mr. Burns. Appellant drove the vehicle on I-76 East and Mr. Butler followed him in his SUV. They exited in Rootstown and appellant pulled over and parked the Mustang. He entered the SUV, which they subsequently parked in a church parking lot. They returned to the Mustang and entered the vehicle. The two men proceeded to drive around the area for over an hour and a half trying to locate an address found on a pill bottle located in the Mustang.

{¶59} Eventually, during the course of their drive, appellant began to disclose the circumstances of why he was in possession of the Mustang. According to Mr. Butler, appellant admitted "that he had shot somebody and we were dropping the car off to get rid of it so he wasn't - - you know, he didn't have the car." Appellant stated he shot "[t]he owner of the car," one Bryan Burns. Mr. Butler noted he was aware of the victim's name because it was on the pill bottle found in the car. Mr. Butler stated appellant "looked at me and said I didn't know - - or he said I didn't do anything with him. I didn't do anything with him. He said I didn't know what he was going to do, Jay.

13

I shot him in the face, Jay. I was scared. That's what he kept saying, he was scared." They subsequently stopped at a Sheetz gas station for assistance finding the address. A clerk at the store assisted the men and they returned to the vehicle. After exiting the parking lot, they were stopped by police.

{¶60} Mr. Butler avoided telling police the information relating to appellant's admission because he did not want appellant to get into trouble. Mr. Butler admitted to hiding appellant's cell phone in a storage unit, wrapped in foil and placed in a shower bag. Mr. Butler indicated he did this to protect appellant.

{¶61} Meanwhile, Lt. Johnson obtained a search warrant for appellant's phone records and, upon receipt, sent them to Beth Dailey, a criminal intelligence analyst with BCI. Ms. Dailey received two separate sets of phone records. Ms. Dailey produced maps with blue dots representing separate call sites, which were fixed locations that registered calls and a single red dot representing the location of the apparent homicide. Ms. Dailey created a map of appellant's phone records on April 20, 2016, between 4:00 a.m. and 12:00 p.m. These records indicated calls registered on a tower one mile from Mr. Burns' residence at 5:01:53 a.m.; 5:22:53 a.m.; 5:41:13 a.m.; 7:24:59 a.m.; and 7:45:24 a.m.

{¶62} Lt. Johnson also obtained a search warrant for the Hammel Street residence. Detective Trent Springer, of the Portage County Sheriff's Department, executed the search warrant at the residence and found various items belonging to appellant in the home's basement. In particular, Det. Springer retrieved appellant's birth certificate in a wallet and a laptop. When he opened the computer, the name Bryan

14

Burns appeared. The computer was found between a mattress and a box spring appellant was using.

{¶63} On May 13, 2016, Det. Springer met with Mr. Butler who took the detective to the storage unit where appellant's cell phone had been hidden. Once recovered, Lt. Johnson was able to extract information from the phone. The phone had appellant's name programmed into it, his cell phone number, and email address. The phone also included an application called Google Location Manager that tracked a driving pattern on April 20, 2016, from 7:47 a.m. to 8:13 a.m. The phone application indicated the phone had traveled from Rootstown at 7:47 a.m., when the Location Manager commenced tracking, to Akron at 8:13 a.m. At 7:47 a.m., the phone tracked the location to State Route 44, a short distance from Smith Avenue, the location of the incident.

{¶64} Also on the phone was a photograph of a Hi-Point .9mm semiautomatic handgun and the magazine to go with it. Lt. Johnson was able to determine, via the photo's metadata, that the image was taken by the phone at 12:22 a.m. on April 21, 2016. The image was sent, via message, to a person listed in the phone as "Bad lil" at 12:28 a.m. that same morning. "Bad lil" is the nickname for an individual identified as Trevon Barclay, an apparent associate of appellant's. The firearm in the image and the caliber of the cartridge recovered from the Burns' residence were consistent.

{¶65} Detective Elizabeth Ittel, of the Portage County Sheriff's Office, reads certain jail inmates' incoming and outgoing mail. She was asked to read appellant's mail in the instant matter. Det. Ittel noted that she is able to glean an inmate's nickname or street name from Facebook, their mail, or via recorded telephone conversations. Through her involvement in the underlying matter, she learned appellant

15

used the street name "Skinny" or "Skinny Black." In the course of reviewing appellant's mail, Det. Ittel intercepted the following letter addressed to "Lil Bad":

{¶66} What's up my - - the N word. Not shit this way. They trying to get an N bro. They can't fuck with you doe no matter what they say, but it's sweet doe. Hey, take that shit and Summit Lake that bitch. Easy come, easy go. When I get home it's going and I got you bro. You know you're may N. I got plenty more where that came from, you feel me? Then people said they came and hollered at you. Don't worry; you good. I didn't give you nothing, so you good. It's all good. I hope you know what I'm saying. Read this over and over if you gotta, but Summit Lake that shit and easy come, easy go. Real talk. When I get home we gonna chill and turn up. I want one of them jugs of fruity drank you N's be making and I got some songs to N. Hot shit. I'm lightweight-cold on the music side. Well, I hope you get this in time. Signed Skinny. (Sic throughout).

{¶67} Several days before appellant's trial, a fellow jail inmate, William Lemons, was conversing with appellant in his cell. Mr. Lemons knew appellant as "Skinny" and indicated they were talking about their mutual cases when appellant admitted to shooting Mr. Burns. Mr. Lemons notified Lt. Johnson and Detective Dan Burns of the Portage County Sheriff's Office of the content of his conversation with appellant. According to Mr. Lemons, appellant told him:

{¶68} Certain details of his case, about how he shot Mr. Burns. He didn't really get too specific, but he shot him from behind because he couldn't look at him in his face. He told me about his cell phone that was in the storage unit that was discovered – or brought forward from a friend, that was wrapped in aluminum foil, some period of time later. You know, he disclosed about the fire, you know, there was some accelerant used in the house somewhere. I didn't know what bedroom it was, but the way he was describing to me the case, it was in a bedroom. I didn't know which one. You know, he didn't disclose which bedroom it was. You know, as far as shooting Mr. Burns, he disclosed to me that he could not look him in the face. It was from behind.

{¶69} Appellant told Mr. Lemons the firearm he used was "in water somewhere" and would never be found. Appellant emphasized that, in his estimation, the only

evidence against him was gunpowder residue on his coat and the cell phone taken from the storage unit. Appellant advised Mr. Lemons that his family comes from a long line of gangsters and he had "to take his own actions, you know, because it had to be done." Mr. Lemons was not certain what appellant meant by this.

**{¶70}** **MANIFEST WEIGHT ANALYSIS**

**{¶71}** The state's evidence demonstrated the following: Appellant admitted to committing the crimes to two individuals; these admissions occurred separately, but included similar details; appellant was in possession of or had access to a firearm of similar caliber to the shell casing found in the Burns' residence, near Mr. Burns' body; appellant was in possession of or had access to that firearm in close temporal proximity to the commission of the crime; a picture of the firearm was sent from his phone to an associate, "Lil Bad," a day after the crimes were committed; appellant stated he or an associate disposed of the firearm "in the water" to one of the individuals to whom he confessed; while in jail, a letter written to "Lil Bad," indicated he wanted "Lil Bad" to "Summit Lake that shit;" appellant was last seen with Mr. Burns by his girlfriend just hours before the murder took place; his phone records reveal he was at or near the Burns' residence when the crimes took place; when appellant was arrested, he was in possession of Mr. Burns' Mustang, as well as his bank cards; and upon execution of a search warrant of his residence, Mr. Burns' computer was seized from under appellant's mattress.

**{¶72}** Notwithstanding the foregoing, appellant underscores that investigators were never able to find the firearm that killed Mr. Burns. Nevertheless, as indicated above, the state presented evidence that appellant was in possession of or had access

17

to a Hi-Point .9mm firearm immediately after the murder occurred. The state additionally presented evidence that appellant, or another individual at appellant's behest, disposed of the weapon in a body of water. Moreover, two witnesses, viz. appellant's friend, Mr. Butler and fellow inmate, Mr. Lemmons, testified appellant admitted to shooting Mr. Burns in the head. Appellant attempts to dismiss the circumstantial evidence and witness testimony as not credible; issues of credibility, however, are for the trier of fact to resolve. Thus, even though the murder weapon was never found, the evidence submitted by the state provided a foundation for the trier of fact to conclude appellant was the perpetrator of the crimes beyond a reasonable doubt.

{¶73} Appellant additionally emphasizes that the gunshot-residue test conducted by Donna Schwesinger, BCI gunshot residue analyst, on black gloves recovered in Mr. Burns' Mustang only disclosed a small particle on the left-hand glove; further testing on appellant's jacket revealed several particles on the left cuff and eight particles on the right cuff. Appellant underscores Ms. Schwesinger's testimony that such residue can transfer from person-to-person and thus, he maintains, there was reasonable doubt that he shot Mr. Burns. Appellant's argument is speculative and does not create *reasonable* doubt.

{¶74} Simply because residue might, as a general principle, be transferrable, does not negate the persuasive force of the remaining evidence which strongly supported the state's theory of the case. Accordingly, even though Ms. Schwesinger could not rule out appellant's "transfer" scenario, there was no alternative, credible suspects identified by the defense.

{¶75} The trier of fact is free to believe all, part, or none of the testimony of each witness appearing before it. *State v. Grayson*, 11th Dist. Lake No. 2006-L-153, 2007-Ohio-1772, ¶31. The fact finder is in the best position to adjudicate the credibility of the witnesses and construe the evidence in light of witness testimony. *Id.* at ¶30. Even if the evidence is vulnerable to more than one interpretation, an appellate court must construe it in a manner consistent with a reasonable verdict. *Id.* at ¶31. And, in a criminal bench trial, an appellate court will not reverse a conviction "'where there is substantial evidence upon which the court could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt.'" *Id.*, quoting *State v. Arnoldm,* 12th Dist. Butler No. CA99-02-026, 1999 WL 699866, *10 (Sep. 7, 1999) (citations omitted).

{¶76} In this case, the evidence advanced by the state supports the conclusion, beyond a reasonable doubt, that (1) appellant committed theft offenses, i.e., taking Mr. Burns' bank cards, and potentially any remaining money from Mr. Burns' $303.00 bank-machine withdrawal; (2) while having a deadly weapon upon his person and using the same, i.e., the Hi-Point .9mm firearm depicted in the photo found in appellant's phone; (3) to purposely cause the death of Mr. Burns with the weapon. The trial court's conclusion that appellant committed aggravated murder while committing or immediately after committing aggravated robbery is supported by the manifest weight of the evidence. Accordingly, the trial court did not lose its way and commit a manifest miscarriage of justice in finding appellant guilty of the crimes with which appellant takes issue.

{¶77} Appellant's third assignment of error lacks merit.

{¶78} For the reasons discussed in this opinion, the judgment of conviction entered by the Portage County Court of Common Pleas is affirmed.


THOMAS R. WRIGHT, P.J.,

DIANE V. GRENDELL, J.,

concur.